Estate of George Henry Kent, Richard Bulow Kent, Executor v. Commissioner.
Estate of George Henry Kent v. Commissioner
Docket No. 9214.
United States Tax Court
1947 Tax Ct. Memo LEXIS 113; 6 T.C.M. (CCH) 933; T.C.M. (RIA) 47233; August 12, 1947
*113 1. Decedent died testate in 1941 at the age of 88. For more than 32 years prior to his death he had been making gifts to members of his family and close relatives. It was his dominant policy throughout life to make each member of his family financially independent in so far as he was able to make gifts without jeopardizing his own financial position, and to see that such gifts were available to the respective members of his family when they would do the most good. He had always enjoyed fairly good health except for an attack of cerebral thrombosis on September 25, 1935, which kept him in bed for about eight days. Early in 1935, he discussed with his two children his desire to make each of them additional gifts but wanted to wait and see what Congress would do with respect to gift tax rates in the then pending Revenue Bill which was approved as the Revenue Act of 1935 on August 30, 1935. After obtaining and studying a copy of the new Act, decedent and his son were preparing a schedule of securities preparatory for completing the gifts when the attack occurred. A month later after he had substantially recovered from his illness he made the gifts he had formed plans to make early in *114 the year. Held, the said gifts made on October 25, 1935, were not made in contemplation of death and should not therefore be included in the decedent's gross estate under section 811 (c) of the Internal Revenue Code. 2. Upon the evidence, held, petitioner is entitled to a deduction under section 812 (b) (3), I.R.C. of an amount greater than that allowed by the respondent on account of decedent's liability under an apartment lease which had 10 more months to run subsequent to decedent's death. Rudolph L. von Bernuth, Esq., One Wall St., New York 5, N. Y., for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. BLACK
Memorandum Findings of Fact and Opinion This proceeding is for a redetermination of a deficiency of $37,293.40 in estate tax. Petitioner claims an overpayment in the amount of $1,803.53. In a statement attached to the deficiency notice the respondent, among several adjustments to the net estate, increased the net estate as disclosed by the return by including "Transfers" in the amount of $120,603.80, and by disallowing Item 14 of "Debts" in the amount of $1,050. The net result of all the remaining adjustments made by the respondent to the net estate was in petitioner's favor and these remaining adjustments are not in controversy. The portions of the statement explaining the adjustment relating to "Transfers" and Item 14 of "Debts" are as follows: Transfers During Decedent's Life: Returned
Determined
Gift in 1935 to Richard B,
Kent (securities and
cash)
$ 0.00
$60,305.83
Gift in 1935 to Emily
Kent Platt (securities
and cash)
0.00
60,297.97
*116 Said gifts are included in decedent's gross estate. The transfers included in the decedent's gross estate have been determined to have been made in contemplation of death. Deductions: Debts:
Returned
Determined
Item 14
$2,100.00
$ 1,050.00
Item 14 of Debts is adjusted so as to allow a deduction only for decedent's share of liability for rental of apartment being occupied by him and his son, Richard B. Kent, at the date of his death. Petitioner by appropriate assignments of error contests the entire adjustment relating to "Transfers" and Item 14 of the adjustment relating to "Debts". As to Item 14 petitioner also assigns as error that he should have claimed $3,000 on the return instead of $2,100 and that the respondent erred in not allowing $3,000 instead of $1,050 "as a deduction for decedent's share of liability for the rental and household expenses of the apartment occupied by him and his son, Richard B. Kent, at the time of his death." Petitioner also assigns as error the following: "(g) Respondent has erroneously failed to determine that the estate tax liability on the estate of the decedent was not in excess of the sum of $49,448.57 before, and *117 the sum of $47,388.68 after, allowing credit for the payment of the New York State Estate Tax." In the above mentioned statement attached to the deficiency notice, the respondent determined that petitioner's estate tax liability was $86,485.61; that $49,192.21 had been assessed; and that there was a deficiency of $37,293.40 before allowing any credit for estate, inheritance, legacy, or succession taxes under section 81.9 of Treasury Department Regulations 105. The claimed overpayment of $1,803.53 is the difference between $49,192.21 assessed and the $47,388.68 mentioned in assignment of error (g). Petitioner arrived at the alleged estate tax liability of $49,448.57 mentioned in assignment of error (g) after eliminating from the gross estate as determined by the respondent the two transfers totalling $120,603.80 and after deducting an additional $1,950 over what the respondent allowed under Item 14 of "Debts". As to the credit for the payment of the New York State Estate Tax, the respondent in the said statement says in part: "* * * opportunity will be accorded for the submission of the evidence required by Section 81.9 of Regulations 105." Findings of Fact Some of the facts are *118 contained in a stipulation of facts which we incorporate herein by reference. George Henry Kent, the decedent herein and hereafter referred to as such, a resident of the City of New York, was born on November 11, 1853 and died in the City of New York at 10:00 A.M. November 5, 1941. The Federal estate tax return for the estate of the decedent was filed with the Collector for the Third District of New York on February 5, 1943. The decedent died testate and his will was proved and admitted for administration in the Surrogate's Court of the County of New York on November 14, 1941. The will was executed on June 16, 1932 and the material provisions thereof are as follows: "I, GEORGE HENRY KENT, of the Borough of Manhattan, County and State of New York, do make, publish and declare this to be my last Will and Testament, hereby revoking any and all other Wills and codicils by me made. "FIRST: I direct the payment by my Executors hereinafter named of all my just and legal debts and funeral expenses as soon after my death as practicable. "SECOND: All the rest, residue and remainder of my property, real, personal and mixed, of what name, nature and description, soever and wheresoever *119 situate, I give, devise and bequeath unto my son, Richard Bulow Kent, and my daughter, Emily Kent Platt, in equal shares, to them and their heirs forever." Richard Bulow Kent and the decedent's son-in-law, Washington Platt, were duly appointed executors under the last will and testament of the decedent, qualified as such and Richard Bulow Kent has continued to act as executor since November 14, 1941. Platt, by order of the Surrogate's Court filed January 5, 1944, was suspended from the exercise of his powers and duties as such executor while he remained engaged in war service and until the further order of said court. Platt left the war service in the Army of the United States during the year 1945 and there has been no further order of said Court as of the date of the hearing herein. Decedent was survived by his son, Richard Bulow Kent, born in 1895, his daughter, Emily Kent Platt, born in 1897, and four grandchildren: Emily Kent Platt born in 1923; Eleanor Washington Platt born in 1924; Mary Perine Platt born in 1928; and Lucian Brewster Platt born in 1931. The grandchildren are the children of decedent's daughter and son-in-law who were married in 1921. Decedent was also survived *120 by a half-sister, Katherine A. Kent, who was 82 at the time of the hearing, and by a half-brother, Henry W. Kent, who was 80 at the time of the hearing. Decedent's wife died during the calendar year 1930 and left a gross estate of approximately $240,000 and a net estate of approximately $235,000 in equal shares to her two children, Richard Bulow Kent and Emily Kent Platt. Decedent's father, Robert Restiau Kent, died in 1907 at the age of 82, and his grandfather, Henry Sewell Kent, died at the age of 84. From May 15, 1909, to and including October 25, 1935, the decedent made gifts as follows, the values stated being the decedent's determination thereof at the time of the transfer: Item No.
Date
Donee
Description
Value
1
5-15-09
Katherine A. Kent, half-sister
(Securities)
$25,500.00
2
10-21-12
Adelaide B. Kent, wife
(Securities)
37,700.01
3
12-31-12
Adelaide B. Kent, wife
(Securities)
26,172.50
4
3- ?-15
Adelaide B. Kent, wife
(Securities)
10,758.50
5
9- 1-15
Adelaide B. Kent, wife
(Securities)
46,075.00
6
9- ?-15
Adelaide B. Kent, wife
(Securities)
11,813.75
7
12-14-16
Richard B. Kent, son
(Securities)
30,435.65
8
12-14-16
Emily Kent (Platt), daughter
(Securities)
30,435.65
9
1- 1-19
Adelaide B. Kent, wife
(Securities)
13,632.92
10
3-22-20
Emily Kent (Platt), daughter
(Securities)
9,790.00
11
7-28-24
Henry W. Kent, half-brother
(Securities)
19,586.15
12
12- 3-28
Washington Platt, son-in-law
(Securities)
6,017.85
13
9- 9-29
Richard B. Kent, son
(Securities)
33,472.03
14
9- 9-29
Washington Platt, son-in-law
(Securities)
33,469.72
15
10-25-35
Richard B. Kent, son
(Securities and Cash)
49,500.00
16
10-25-35
Emily Kent Platt, daughter
(Securities and Cash)
49,500.00
*121 Items 15 and 16 of the preceding paragraph are the transfers here in question. The items had values as of November 5, 1942, the optional valuation date under section 811 (j) of the Internal Revenue Code, of $60,305.83 and $60,297.97, respectively. The respondent determined that these two gifts made on October 25, 1935 were made in contemplation of death. Subsequent to October 25, 1935, the decedent made additional gifts as follows: Date
Donee
Description
Value
12- ?-35
Richard B. Kent, son
(Cash)
$4,750.00
12- ?-35
Emily Kent Platt, daughter
(Cash)
4,750.00
10-28-36
Richard B. Kent, son
(Securities)
4,873.75
10-28-36
Washington Platt, son-in-law
(Securities)
4,873.75
12-14-36
Emily Kent Platt, daughter
(Securities)
4,647.50
12- 1-39
Richard B. Kent, son
(Cash)
4,000.00
12- 1-39
Emily Kent Platt, daughter
(Cash)
4,000.00
11- 1-40
Richard B. Kent, son
(Cash)
3,500.00
11- 1-40
Emily Kent Platt, daughter
(Cash)
3,500.00
Decedent's dominant policy throughout life was to make each member of his family financially independent in so far as he was able to make them so, and that such funds should be available *122 to the respective members of his family when such funds would do the most good. His parents had been poor and as a young man he had had a very hard time. His one main dread was a fear of poverty. Decedent's wife had practically no property when they were married. The estate which she left was due largely to the gifts decedent had made to her during their married life. The decedent supported his father from about the time Richard was born until his father's death. He also provided for the schooling of his half-sister and his half-brother. They had practically no capital outside of what the decedent gave them. The gifts made by decedent in 1916 of $30,435.65 each to his son and daughter were made so that each would have a principal sufficient to earn from $1,500 to $1,600 a year, which income was to be used by the children to defray their college expenses. Richard went to Yale and Emily went to Wellesley. Richard did not finish his college career due to his service in World War I. Emily graduated from Wellesley in 1920. When decedent made these gifts in 1916, he opened a set of books for each child and taught them how to keep them. At the same time he told his daughter that it was *123 much better for her to learn how to take care of money rather than just to be paid an allowance. Decedent was an accountant himself and kept a complete set of records of his own financial affairs. The gift made by decedent in 1920 to his daughter was made just prior to her graduation from college and was for the purpose of providing additional income to cover her prospective increased cost of living after graduation, including her contribution at home for board. The gift made by decedent in 1924 to his half-brother was to provide him with capital to make him independent on his intended retirement from his position as secretary to the Metropolitan Museum of Art. The gift made by decedent in 1928 to his son-in-law was made for the purpose of establishing a so-called children's fund to be used for the education of decedent's grand-children. The securities were transferred in Platt's name without any legal restrictions and Platt always had the idea that the decedent had a considerable interest in observing how Platt would handle the gift. The gift made by decedent in 1929 to his son-in-law was for the same purpose as the 1928 gift, namely, as an addition to the children's fund; and *124 the gift to his son made on the same day was simply to match the gift to his son-in-law and to make him financially more independent. For over 25 years prior to 1923 decedent was the general manager for Williams & Peters, a wholesale coal company. He ran their entire office and had charge of their books and all financial matters. He was not a member of the firm and was on a salary basis. The firm dissolved in 1923. For a short time thereafter he went with a firm called Pattison & Bawne, but in 1925, he retired at the age of 72 on account of his wife's ill health. After decedent retired from business in 1925, he remained active in the management of his personal financial affairs until his death. He kept a detailed set of books covering his own transactions. The decedent's income and the sources thereof and his capital assets as of January 1 of each year from 1910 to September 30, 1941, were shown by his books as follows: Profit or (Loss)
Income from
Income from
on Sale of
Total
Capital
Year
Salary
Securities
Securities
Income
Assets
1910
$11,199.96
$ 9,388.50
$11,378.99
$31,967.45
$204,900
1911
11,299.96
9,386.50
(11,079.27)
9,607.19
207,500
1912
11,299.96
9,494.37
( 6,006.50)
14,787.83
182,000
1913
11,199.96
13,792.31
3,820.00
28,812.27
177,500
1914
9,499.96
7,726.86
3,238.98
20,465.80
154,800
1915
10,000.00
8,707.64
10,706.94
29,414.58
145,570
1916
6,629.96
9,713.53
4,250.47
20,593.96
156,225
1917
11,000.00
17,370.34
6,342.81
34,713.15
146,000
1918
11,042.00
13,768.54
1,925.31
26,735.85
174,000
1919
11,000.00
14,130.99
15,223.90
40,354.89
198,700
1920
11,097.00
14,997.14
3,369.74
29,463.88
216,500
1921
11,054.00
14,987.26
141.00
26,182.26
189,100
1922
11,018.00
13,605.42
( 9,512.34)
15,111.08
203,430
1923
11,000.00
18,563.90
40,743.85
70,307.75
270,400
1924
7,020.00
21,297.22
( 217.63)
28,099.59
300,000
1925
500.00
20,070.86
8,319.84
28,890.70
332,400
1926
24,192.05
21,901.69
46,093.74
387,000
1927
27,333.36
8,106.79
35,440.15
400,000
1928
29,919.48
32,111.46
62,030.94
475,000
1929
37,128.56
28,190.91
65,319.57
550,000
1930
39,350.82
8,926.81
48,277.63
555,000
1931
24,413.72
5,502.26
29,915.98
461,800
1932
14,480.38
(45,758.36)
(31,277.98)
258,600
1933
11,996.46
( 2,307.09)
9,689.37
233,000
1934
15,557.75
165.63
15,723.38
255,000
1935
14,658.17
5,853.19
20,511.36
283,000
1936
12,261.94
913.50
13,175.44
242,000
1937
11,557.74
449.25
12,006.99
275,700
1938
11,398.28
1,013.90
12,812.18
250,000
1939
11,646.05
1,132.25
12,778.30
260,150
1940
12,954.70
691.61
13,646.31
254,000
1941
8,426.74
8,426.74
253,900
*125 Decedent's viewpoint, except for 1932, was always cheerful and forward looking. The economic depression which began in 1929 hit the decedent the hardest in 1932. In that year the decedent lost $45,758.36 in the sale of securities and his capital assets dropped from $555,000 on January 1, 1930 to $233,000 on January 1, 1933. He was fearful that his entire fortune might be lost. He reduced his living expenses from $19,079.52 in 1931 to $11,629 in 1932, partly by dispensing with his private automobile and chauffeur. At that time his daughter and son-in-law were living in Syracuse, New York. The decedent went up to Syracuse to look for a cheaper place to live and to see if he could obtain employment. Also at about that time (July 1932) his half-brother, Henry W. Kent, was visiting in London, England. The decedent wrote Henry to return home. The next day the decedent visited his physician, Dr. W. L. Niles. At the conclusion of this visit Dr. Niles on July 7, 1932, wrote Henry a letter, the body of which is as follows: "Your brother has just been in to see me and told me that he wrote to you yesterday, advising you to return home. He is naturally very much disturbed nervously and mentally *126 and for some reason got into his head that he is likely to die most any time. This is, however, just an expression of his depression, for physical examination shows him to be in just as good condition as usual except for loss of weight. I am sure that I was able to cheer him up and offer him reassurance, which he needed badly. He says that if he can live for a year or so, that things will be better and I see no reason, excepting his rather advanced age, why he should not get along just as well as in the past. "I am writing this particularly because I am very anxious that you should not return home and so far as I can judge there is no necessity for your doing so. I discussed this with your brother and he agrees, saying that he would write you to that effect. So, I hope that you will not come back unless you receive further word. I hope also that you are having a pleasant and happy vacation." As the security market and general economic conditions improved, decedent likewise improved and by 1935 he had completely recovered his poise and viewpoint and was more optimistic and free from anxiety which continued until his death. On April 30, 1924, decedent consulted Dr. Niles for a *127 physical check-up. The examination disclosed an "excellent heart" and a generally good physical condition for a man then 70 years of age. Dr. Niles had as associates Dr. Dan Witt and, from 1928 on, Dr. Kirby A. Martin. Dr. Niles and Dr. Witt are both dead. On October 9, 1928, decedent went for another check-up. Beginning in 1929 he went one or more times each year until his sudden death in 1941. During all this time the only illness of any serious concern was an attack of cerebral thrombosis on September 25, 1935. The decedent did not have a physician on that day but on the following day Dr. Witt was called twice to see the decedent. He also made one call each on the 27th, 28th and 30th of the same month, and one call each on the 2nd and 5th of October. During this illness the decedent had a trained nurse for two weeks. He was in bed about 8 days and on the 12th day he got up and dressed. On October 14, 1935, which was about two and one-half weeks after the attack, he walked about two miles to the doctor's office. Regarding that visit Dr. Niles, in the records which he kept in his office, recorded the following: "Oct. 14, 1935. 2 1/2 weeks ago had a cerebral thrombosis. Affected *128 right face and right hand and speech and swallowing. Weak. Digestion O. K. Bowels O. K. Heart quiet. Walked two miles. Dyspnea none. Talks more slowly. Can't shave well with right hand. Physical examination, weak right face, blurred speech, gripp and locomotion O. K." Decedent recovered from this attack and had no serious illness thereafter. On the day he died he had written a long letter to Platt, his son-in-law, who was then a colonel in the Army. In this letter he was quite concerned over Richard who was then very ill in the hospital. The only reference he made to his own health was: "I was sick for five days with diverticulitis, inflamed pockets in transverse colon, painful but now apparently cleared up." The final record made by Dr. Niles was made the day after the decedent died and is as follows: "11-6-41 (WLN:CF) I saw patient on 11-3-41 and his circulation was perfect. He seemed much better. Dr. Martin saw patient on 11-4-41 when he seemed in satisfactory condition post. Bronchitis and to be improving. Patient had a good night's rest and ate a good breakfast (11-5-41). He went to bathroom and was shortly found on the floor apparently having hit his head, and obviously dead. *129 Cause of death: probably coronary." At the time decedent made the transfers here in question, October 25, 1935, he gave no evidence of contemplating death in the near future. He was cheerful and optimistic and had stated a few days before to his nurse, who had attended him when he had the attack of cerebral thrombosis, that his family had all lived to be old and that he expected to live to an age of 90 years or more. In 1939 decedent privately published a book entitled "Suggestions Of Fundamental Principles For Thought And Action", which was a compilation of material written from time to time through the years from 1908 to 1939, the year of publication, which he distributed among his family and friends. At the time of his death decedent was planning to writ another book. Early in 1935 decedent had discussions with his two children and son-in-law concerning the making of the gifts here in question. The decedent's daughter and son-in-law then had four children and their expenses were considerably increased. The oldest child was ready to go to boarding school. The decedent's capital assets had increased from $233,000 on January 1, 1933 to $283,000 on January 1, 1935, and he felt that *130 he was again in a position to help his daughter and her family. At that time the decedent's daughter and son-in-law together possessed a net worth of approximately $189,000 and the decedent's son possessed a net worth of something between $100,000 and $130,000. These amounts included the amounts which Emily and Richard had received from their mother's estate which had shrunk some in 1932 but which had improved somewhat by 1935. The $189,000 also included the socalled children's fund. The reason the decedent did not make the gifts in question at that time (early in 1935) was because Congress was then considering the revision of the gift tax law and he wanted to wait and see what that revision would be. The new act, called the Revenue Act of 1935, was approved August 30, 1935. The decedent immediately secured a copy of the new act and studied it and he and Richard were making out a schedule of the securities which he was going to give to his children when he had the above-mentioned attack of cerebral thrombosis. This sickness delayed the completion of the gifts which he finally consummated on October 25, 1935. The gift to Richard was made for the purpose of matching the gift to Emily *131 and to further provide him with an independent income. On January 1, 1936, decedent's capital assets were $242,000. At no time did decedent by his gifts place himself in a position where his own financial position was jeopardized. The decedent always said he would keep sufficient property for himself. From 1933 to the date of his death the decedent's income from his securities was considerably in excess of his personal and household expenses including all taxes. Decedent had no hobbies, no extravagances and spent little on himself and his personal effects at the time of his death were valued at $100 or less. Decedent had kept track of the manner in which his son, his daughter and his son-in-law had managed the capital which he had theretofore given them and he was well satisfied with them in this respect. They all conferred continually with the decedent regarding their investments but the decedent did not dictate what they should do. The relations of decedent with his son, his daughter and his son-in-law were cordial and intimate. Decedent, as an active business man and as an accountant, followed carefully and understood the various Federal and state tax laws and was very tax *132 conscious. The transfers made by the decedent to his children on October 25, 1935 were not made in contemplation of death. Issue 2 Richard retired in 1925 and lived with his father until the latter died. During the years 1933 to 1938, inclusive, he contributed $2,000 a year toward rental and household expenses. During the years 1939, 1940 and the first nine months of 1941 he contributed $2,250, $3,000 and $2,250, respectively. On February 10, 1939, he signed a lease on the apartment in which he and his father were living for a term beginning October 1, 1939 and ending September 30, 1942. The rental was $283.34 a month, payable in advance. Prior to the execution of this lease the prior leases were always in the decedent's name. On February 11, 1939, the decedent in his own handwriting wrote and signed the following document: "Feb. 11, 1939 "In the event of my death during the period of this new lease of apt at 277 Park Ave. expiring Sept. 30, 1942 except as provided and as Dick has taken the lease in his name for my convenience I ask my Executor to pay my usual share of the household expenses about $300.00 per month until the termination, after proper notice, of the next *133 succeeding term of the lease. (signed) G. H. Kent" The said lease contained provisions that upon a five months previous notice in writing by registered mail prior to September 30, 1940 or September 30, 1941, the lease could be cancelled on either one of those dates. No such notices were given and so the lease remained effective until September 30, 1942 which was 10 months and 25 days after decedent's death. The rental and household expenses, including all taxes of decedent from January 1 to October 1, 1941, were $7,429.19 toward which Richard contributed $2,250. Opinion BLACK, Judge: The first and main issue in this proceeding is whether the two transfers made by the decedent on October 25, 1935 were made in contemplation of death. The second issue is whether the respondent erred in not allowing $3,000 instead of $1,050 as a deduction for decedent's alleged share of liability for the rental and household expenses of the apartment occupied by him and his son at the time of decedent's death, for a period of about 10 months after the decedent's death. We will first consider the main issue. The applicable statute is section 811 (c) and (j) of the Internal Revenue Code, the material *134 provisions of which are in the margin. [1] Petitioner elected under section 811 (j) to use the optional valuation date one year after the decedent's death. The parties agree that the values on November 5, 1942, one year after the decedent's death, of the two transfers made by the decedent on October 25, 1935, were $60,305.83 and $60,297.97, respectively, or a total of $120,603.80. Petitioner contends, however, that the transfers were not made in contemplation of death and should not, therefore, be included in the decedent's gross estate. The transfers in question were made more than six years before the decedent's death which makes inapplicable the presumption mentioned in section 811 (c) relative to transfers made within two years prior to death. Since, however, the respondent has determined that the transfers were made in contemplation of death, the burden is upon the petitioner to show that they were not so made. *135 The phrase "in contemplation of death" was fully discussed by the United States Supreme Court in United States v. Wells, 283 U.S. 102. In that case the Supreme Court, among other things, said: "The phrase 'in contemplation of death', previously found in state statutes, was first used by the Congress in the Revenue Act of 1916, imposing an estate tax. * * * It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive. * * * The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. * * * As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that it, the motive which induces he transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that naturally gives rise to the felling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are *136 deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. * * * The question, necessarily, is as to the state of mind of the donor. "* * * Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' means that the thought of death is the impelling cause of the transfer * * *
"* * * There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." The above discussion was adhered to by the Supreme Court in the two more recent decisions in Colorado Nat. Bank of Denver, et al. v. Commissioner, 305 U.S. 23 and Allen v. Trust Co. of Georgia, et al. 326 U.S. 630. In the latter *137 case the Supreme Court added: "* * * On the other hand, every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense. Many gifts, even to those who are the natural and appropriate objects of the donor's bounty, are motivated by 'purposes associated with life, rather than with the distribution of property in anticipation of death.' United States v. Wells, supra * * * Those motives cover a wide range. See 1 Paul, Federal Estate & Gift Taxation (1942) §§ 6.09 et seq. 'There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death.' United States v. Wells, supra * * * Whether such a deire was the dominant, controlling or impelling motive is a question of fact in each case." * * * What was the dominant, controlling or impelling motive of the decedent for making the gifts here in question? The evidentiary facts are set out in our findings. These facts, among other things, show that long before there was *138 any Federal estate tax decedent began sharing his wealth with members of his family. The dominant policy of his life was to make each member of his family financially independent in so far as he was able without in any way jeopardizing his own financial position. He took care of his own father during the last 12 years or more of his father's life; he provided money for the schooling of his half-sister and half-brother; and from time to time he made outright gifts to his wife, his half-sister, his half-brother, his daughter, his son and his son-in-law. The only gifts that the respondent has taken exception to are the two that decedent made to his daughter and son on October 25, 1935. We are unable to discern any motive for these latter gifts which would be a departure from the motives which existed for all the others. The principal factor which caused the respondent to determine these two gifts to be made in contemplation of death was the fact that the date of the gifts, October 25, 1935, was just one month after the decedent had an attack of cerebral thrombosis. We do not think that this factor is controlling for the reason that several months before the attack, namely, in the early *139 part of 1935, the decedent had had discussions with his children and son-in-law concerning the making of the gifts in question. He was making diagrams showing the times his grandchildren would be away at schools and colleges and about when the peak of his daughter's expenses would be, and he wanted to make sure that his daughter and son-in-law would be able financially to cover all of that comfortably. His son was not married and had no children but the decedent felt that he should treat his two children equally and so generally when he made a gift to his daughter he also made one to his son. The reason the gifts were not then completed was that Congress at that time was considering the revision of the gift tax law and decedent wanted to wait and see what the revision would be. As soon as the Revenue Act of 1935 was approved on August 30, 1935, decedent secured a copy of the new law and after studying it, he and his son were in the process of preparing a schedule of the securities that would constitute the corpora of the gifts when the attack of September 25, 1935, occurred. In less than three weeks after the attack the decedent had recovered sufficiently so that he could be up and *140 around again and it was then that he completed the gifts he had formed plans to make in the early part of the year. Prior to this attack on September 25, 1935, the decedent had never had any serious illness and he did not have any in the six years that followed, except on the day that he suddenly died. In 1932 he was mentally depressed for a while due to the heavy losses he was sustaining, but as soon as the market improved this depressed mental attitude disappeared. Another circumstance to be noted is that when decedent made the gifts in question, six years prior to his death, he did not give substantially all his property away, thus indicating a testamentary disposition of his property. He had a comfortable fortune left after giving away the property he gave to his children in 1935. The property which he retained until his death was more than ample to support all of his needs, and was included in his estate and taxes paid thereon at his death. After a consideration of all the evidence in this proceeding we are convinced that the dominant, controlling and impelling motive of the decedent for making the gifts in question was simply the continuation of his policy that had been dominant *141 throughout his life to make each member of his family independent in so far as he was able, and to see that such funds should be available to them at a time when they would do the most good. We are convinced from the evidence that petitioner has clearly proved that at the time decedent made these two gifts he was not contemplating death and that motives associated with life were uppermost in his mind and dominated him in making the gifts. Even though it be assumed, as respondent strongly argues in his brief, that one of the factors which influenced decedent to make the gifts here in question at the time he did was to minimize estate taxes that fact, we think, would not overcome the other and more dominant motives which the evidence has established and which we have just above discussed. See Denniston v. Commissioner, 106 Fed. (2d) 925, reversing 38 B.T.A. 1077. In this case the court, in reversing us, among other things, said: "We think that because in carrying out a plan to provide for her children the donor uses a method which she thinks is best calculated to save death taxes the conveyance is not thereby conclusively stamped as 'in contemplation of *142 death.' The desire to avoid estate taxes may be just as clearly present in the mind of a young and vigorous donor who thinks of death as far distant as in that of one who is old and feeble and who looks momentarily for its coming. Standing alone it cannot be deemed conclusive of a mental state such as is contemplated by the statutory phrase 'contemplation of death.'" We have, therefore, after a consideration of all the evidence, found as an ultimate fact that the gifts in question were not made in contemplation of death. It follows that the respondent erred in including the gifts as a part of the decedent's gross estate. United States v. Wells, supra; Colorado Nat. Bank of Denver, et al. v. Commissioner, supra; Allen v. Trust Co. of Georgia, et al., supra; and Estate of Fletcher E. Awrey, 5 T.C. 222, 240. We will now consider the second issue. The applicable statute is section 812 (b) (3) of the Internal Revenue Code, the material provisions of which are in the margin. [2] Richard B. Kent, decedent's son, contends that he personally had a claim against his father's estate for $3,000 on account of the "rental and household *143 expenses" of the apartment occupied by him and his father up until his father's death for the period from his father's death to the date of the expiration of the lease on September 30, 1942. Petitioner has offered no evidence of any kind that Richard B. Kent incurred any household expenses after decedent's death. In the absence of such evidence it is obvious that under no circumstances is petitioner entitled to any deduction under section 812 (b) (3) for household expenses as distinguished from rental expenses. In the deficiency notice the respondent allowed as a deduction under section 812 (b) (3) of the Internal Revenue Code $1,050 as representing the "decedent's share of liability for rental" of the apartment being occupied by decedent and his son at the date of decedent's death. This allowance of $1,050 which the Commissioner has made in his computation of the deficiency was based upon a statement in his 30-day letter which is atached to the petition. This 30-day letter contains, among other things, the following: "EXPLANATION OF CHANGES
IN DEDUCTION
"Schedule K - Debts
of decedent
Return
Corrected
Item 14
$2,100.00
$1,050.00
*144 Item 14 is adjusted to allow for the deduction of a reasonable amount chargeable to the decedent's son for use and occupancy of decedent's apartment during the months subsequent to death, the lease being in the son's name for convenience of the decedent while the premises were shared by both." The evidence on this point was meager and we find nothing in this evidence which shows that the Commissioner erred *145 in adjusting these apartment rentals on a 50-50 basis between father and son. There is one error in this adjustment, however, which needs correction in the light of the evidence. The lease agreement runs from October 1, 1939 to September 30, 1942 at a rental of $3,400 per annum, payable monthly in advance on the first day of the month. The monthly rental was, therefore, $283.33 per month. As the decedent died on November 5, 1941, and as the rental payments were under the lease payable in advance, the decedent must have paid his share of the November 1941 rental payment ($141.66). As the lease expired on September 30, 1942, there remained 10 months for the lease to run (December 1941, January through September 1942). Assuming, as we think we must from the nature of the Commissioner's determination and the nature of the evidence, that the decedent was liable for one-half of the rental for the remaining 10 months, after allowing for the value of the son's occupancy of the apartment, decedent's liability would be $1,416.60 (10 X $141.66). Respondent, in his brief, concedes that this is the amount of the deduction which we should allow petitioner, if petitioner is entitled to any deduction *146 at all on account of this item. Respondent, however, in his brief denies that there was any liability at all on the part of the estate for any part of these rentals. This contention, we think, must be denied in the light of the evidence. Therefore, the amount of $1,416.60 should be allowed as a deduction under Item 14, Schedule K, instead of the $1,050 which the Commissioner has allowed in the deficiency notice. Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * * (c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death * * * except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; * * * (j) Optional Valuation. - If the executor so elects upon his return (if filed within the time prescribed by law or prescribed by the Commissioner in pursuance of law), the value of the gross estate shall be determined by valuing all the property included therein on the date of the decedent's death as of the date one year after the decedent's death * * *.↩
2. SEC. 812. NET ESTATE. For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate - * * * (b) Expenses, Losses, Indebtedness, and Taxes. - Such amounts - * * * (3) for claims against the estate, * * * as are allowed by the laws of the jurisdiction, whether within, or without the United States, under which the estate is being administered, * * *. The deduction herein allowed in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded upon a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth. * * *↩